IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEVEN F. HOTZE, M.D., and           §
BRAIDWOOD MANAGEMENT, INC., §
          Plaintiffs,           §
                                    §
v.                                   §     CIVIL ACTION NO. 4:13-cv-01318
                                    §
KATHLEEN SEBELIUS, U.S.              §
SECRETARY OF HEALTH AND              §
HUMAN SERVICES, and                  §
JACOB J. LEW, U.S. SECRETARY         §
OF THE TREASURY, in their            §
official capacities,                 §
          Defendants.           §

## MEMORANDUM AND ORDER

This case, which challenges the constitutionality of the Patient Protection and Affordable Care Act (the "Affordable Care Act" or "ACA"), Pub. L. No. 111-148, 124 Stat. 119,[1] follows on the coattails of—and in some ways is derivative of—the Supreme Court's recent decision in *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012) ("*NFIB*").   Plaintiffs Steven F. Hotze, M.D. ("Hotze") and Braidwood Management, Inc. ("Braidwood," and together with Hotze, "Plaintiffs") seek a declaratory judgment that the ACA is unconstitutional on two grounds not addressed by *NFIB*: (1) that the ACA violates the Origination Clause of

---

[1]     The Patient Protection and Affordable Care Act was amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029, and by the Department of Defense Full-Year Continuing Appropriations Act, 2011, Pub. L. 112-10, 125 Stat. 38.

the United States Constitution, U.S. CONST. art. I, § 7, cl. 1; and (2) that the ACA violates the Takings Clause of the Fifth Amendment, U.S. CONST. amend. V.

Before the Court is the Motion to Dismiss [Doc. # 14] of Defendants Kathleen Sebelius, U.S. Secretary of Health and Human Services ("Sebelius") and Jacob J. Lew, U.S. Secretary of the Treasury ("Lew," and together with Sebelius, "Defendants"). Plaintiffs have filed a Response [Doc. # 20], to which Defendants have replied [Doc. # 25].

Having carefully considered the parties' briefing, all matters of record, and the applicable legal authorities, the Court holds that Plaintiffs have standing to contest the ACA on the grounds alleged and that this case is otherwise justiciable. The Court further concludes that Plaintiffs have failed to state a claim upon which relief can be granted under either the Origination Clause or the Takings Clause, and that there is no viable amendment to the Complaint that can rectify the deficiencies in Plaintiffs' pleadings. Accordingly, the Court **grants** Defendants' Motion to Dismiss. The claims against Defendants are **dismissed with prejudice**.

## I.   BACKGROUND

### A.   Statutory Background

On October 8, 2009, the House of Representatives (the "House") passed H.R. 3590, otherwise titled at the time the "Service Members Home Ownership Tax Act of 2009." H.R. 3590, 111th Cong., § 1 (Oct. 8, 2009). H.R. 3590 was a bill to make certain changes to the Internal Revenue Code. Specifically, the bill extended or waived the recapture of a first-time homebuyer credit for certain members of the armed forces. *Id.*, §§ 2-3. The bill also expanded exclusions from gross income of certain military-related fringe benefits. *Id.*, § 4. Finally, the bill increased the penalty for failure to file a partnership or "S corporation" tax return from $89 to $110, and

increased certain estimated corporate taxes by 0.5%.  *Id.*, §§ 5-6.

Upon receipt, the Senate struck out the entirety of H.R. 3590 aside from its enacting clause.[2]  In its place the Senate inserted new text under the title "Patient Protection and Affordable Care Act."  H.R. 3590, 111th Cong., § 1(a) (Dec. 24, 2009).  The bill passed the Senate on December 24, 2009.

The amended H.R. 3590 was then sent back to the House.  On March 21, 2010, the House passed H.R. 3590 as amended.  Concurrently, the House passed H.R. 4872, entitled the "Health Care and Education Reconciliation Act of 2010," which made certain amendments to the ACA.[3]  President Obama signed H.R. 3590 into law on March 23, 2010.  *See* Pub. L. 111-148.  The Senate passed H.R. 4872 on March 25, 2010, and the President signed it into law on March 30, 2010.  *See* Pub. L. 111-150.

Two particular provisions of the ACA are relevant to this case.  First, under the ACA, individuals not otherwise exempted from the law's coverage must either maintain "minimum essential coverage" or, in the alternative, must pay "a penalty with respect to such failures."  26 U.S.C. § 5000A (the "individual mandate" or "minimum coverage provision").  Second, where "any applicable large employer fails to offer to its full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan" and where "at least one full-time employee of the applicable large employer has been certified . . . as having enrolled for such month in a qualified health plan with respect to which

---

[2]     The enacting clause reads: "Be it enacted by the Senate and House of Representatives of the United States of American in Congress assembled."

[3]     The House had, on November 7, 2009, passed a bill largely similar to the amended H.R. 3590, entitled the "Affordable Health Care for America Act."  H.R. 3962, 111th Cong., § 1(a) (Nov. 11, 2009).  That bill was not acted on by the Senate in that form.  The House ultimately passed H.R. 3590 and H.R. 4872 instead.

an applicable premium tax credit or cost-sharing reduction is allowed or paid with respect to the employee," the employer will be assessed a payment.[4]  26 U.S.C. § 4980H (the "employer mandate" or "employer responsibility provision").[5]

**B.**   ***NFIB v. Sebelius***

The Supreme Court has previously addressed the constitutionality of the ACA in *National Federation of Independent Business v. Sebelius* ("*NFIB*").  At issue in *NFIB* was the constitutionality of the individual mandate and the ACA's Medicaid

---

[4]   The employer mandate, in other words, requires certain large employers to either: (1) provide their employees healthcare insurance coverage that meets minimum standards as laid out in the ACA; or (2) be assessed a "shared responsibility payment" *if* at least one of their employees would qualify for a tax credit or cost-sharing reduction through purchase of an insurance plan on the individual health insurance markets.  Both employers who offer insurance that does not meet minimum standards and employers who do not offer any insurance at all can be assessed these payments. *See generally* "What is the Employer Shared Responsibility Payment?," HEALTHCARE.GOV (last accessed January 7, 2014).

[5]   The Court adopts and uses the terms "individual mandate" and "employer mandate" as shorthands to refer to § 5000A & § 4980H, respectively.  The phrase "individual mandate" is to some extent a misnomer in light of *NFIB*, which held that individuals fully comply with the law if they "choose to pay [a tax] rather than obtain health insurance." *NFIB*, 132 S. Ct. at 2597.  Under that analysis, individuals are not *mandated* to purchase insurance, but rather are given the lawful choice between obtaining insurance or paying a tax. *See* Marty Lederman, Hobby Lobby *Part III–There is no "Employer Mandate"*, BALKANIZATION (December 16, 2013, 9:366 AM), http://balkin.blogspot.com/2013/12/hobby-lobby-part-iiitheres-no-employer.html.  The Court adopts a similar analysis below with respect to the "employer mandate." *See infra* Part V.  Nevertheless, the Court uses the individual mandate and employer mandate phrases because that is how the statutory provisions colloquially are known, and because other courts, including those that have rendered decisions on the issues presented in this case, have adopted that terminology. *See, e.g.*, *NFIB*, 132 S. Ct. 2566; *Liberty Univ., Inc. v. Lew*, 733 F.3d 72 (4th Cir. 2013); *Sissel v. U.S. Dep't of Health and Human Servs.*, __ F. Supp. 2d __, 2013 WL 3244826, at *6 (D.D.C. June 28, 2013).

expansion.   The Supreme Court's opinion regarding the individual mandate is particularly important to the issues presented in this case.

Chief Justice Roberts, writing for the Court in this regard,[6] first rejected the Government's argument that the individual mandate is a "valid exercise of Congress's power under the Commerce Clause and the Necessary and Proper Clause."  *NFIB*, 132 S. Ct. at 2585.   The Commerce Clause, the Court held, "presupposes the existence of commercial activity," and the individual mandate "compels individuals to *become* active in commerce by purchasing a product, on the ground that their failure to do so affects interstate commerce."  *Id.* at 2586-87 (emphasis in original). That distinction, in the Court's view, was fatal to the Government's Commerce Clause argument—the Court effectively rejected the "proposition that Congress may dictate the conduct of an individual today because of prophesied future activity."  *Id.* at 2590.[7]

The Court, however, ultimately *upheld* the constitutionality of the individual

---

[6]    The *NFIB* Court was splintered.  Chief Justice Roberts' opinion announced the judgment of the Court and is the controlling opinion.  His opinion was joined by Justices Ginsburg, Breyer, Sotomayor, and Kagan with respect to Parts I, II, and III-C and by Justices Breyer and Kagan with respect to Part IV.  Notably, no other Justice joined his opinion with respect to Parts III-A, III-B, and III-D.  Justice Ginsburg, joined by Justice Sotomayor and Justice Breyer and Kagan in part, filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part.  Justices Scalia, Kennedy, Thomas, and Alito filed a joint dissent, and Justice Thomas filed a separate dissent.

[7]    The Court also rejected the Government's argument under the Necessary and Proper Clause because, to sustain an action under that Clause, Congress's "exercise[] of authority" must be "derivative of, and in service to, a granted power," and, in contrast to previous cases, "the individual mandate . . . vests Congress with the extraordinary ability to create the necessary predicate to the exercise of an enumerated power." *NFIB*, 132 S. Ct. at 2592.

mandate under Congress's power to "lay and collect Taxes."  U.S. CONST. art. I, § 8, cl. 1.  The Court noted that "shared responsibility payment(s)" due under the ACA for those not obtaining minimum essential coverage is paid into the Treasury in conjunction with tax returns, that the provision is found in the Internal Revenue Code, and that "it produces at least some revenue for the Government."  *NFIB*, 132 S. Ct. at 2594.  The Court also rejected the argument that the payments should be considered "penalties" instead of taxes.  *Id.* at 2595-96.  Moreover, the Court stressed that although the individual mandate is designed to "induce the purchase of health insurance," there are no legal consequences for not doing so, and one who foregoes purchasing insurance and instead chooses to make a payment to the IRS has "fully complied with the law."  *Id.* at 2596-97.  Thus, the Court found the individual mandate to comply with Congress's taxing power, even though it effectively imposes a tax on individuals for their "inactivity."  *Id.* at 2599-600.  Significantly, the Court noted that "[a]lthough the payment will raise considerable revenue, *it is plainly designed to expand health insurance coverage*."  *Id.* at 2596 (emphasis added).[8]

### C.   Plaintiffs' Claims

Plaintiffs in this case are a Texas corporation and an individual Texas resident. Braidwood is a corporation that "manages health and wellness services for patients."[9] Braidwood has approximately 73 full-time employees, and currently offers a "high-

---

[8]     The balance of Chief Justice Roberts' opinion is devoted to the constitutionality of Congress's expansion of Medicaid, a discussion not relevant to the issues at bar.

[9]     Complaint, ¶ 10.  While Plaintiffs have not filed an amended complaint in this case, the Court construes the new factual allegations in Plaintiffs' Response to the Motion to Dismiss [Doc. # 20] as a supplement to their Complaint.

deductible" health coverage plan to employees.[10]  Hotze is "the founder and one of the employees of Plaintiff Braidwood."[11]  He currently participates in the health plan offered by Braidwood.[12]

The claims that Plaintiffs press are different from those in *NFIB*.  Plaintiffs here seek a declaratory judgment that the entire ACA is unconstitutional because Congress passed the law in violation of the Origination Clause.[13]  U.S. CONST. art. I, § 7, cl. 1. In addition, Plaintiffs seek a declaratory judgment that the ACA "constitutes a taking within the meaning of the Takings Clause of the Fifth Amendment because ACA compels Plaintiffs to pay money to other private entities: government-approved health insurance companies."[14]  Plaintiffs also seek injunctive relief "prohibiting Defendants from enforcing ACA against Plaintiffs and similarly situated residents of Texas."[15]

---

[10]     Complaint, ¶¶ 3, 23.

[11]     *Id.*, ¶ 11.

[12]     *Id.*

[13]     *Id.*, ¶¶ 37-56.

[14]     *Id.*, ¶¶ 57-64.

[15]     *Id.*, Prayer for Relief, cl. v.  Certain phrases in the Complaint reference other constitutional provisions.  For example, in two different places Plaintiffs state that the ACA violates the Tenth Amendment.  *See* Complaint, ¶¶ 54, Prayer for Relief, cl. iii. However, Plaintiffs do not allege a separate cause of action under this Constitutional Amendment.  Nor have Plaintiffs responded to the Motion to Dismiss on the basis of this theory.  Thus, the Court construes these references to be part and parcel of Plaintiffs' Origination Clause claim.  Similarly, Plaintiffs state that the tax imposed under the individual mandate is "non-uniform," in violation of the Uniformity Clause, U.S. CONST. art. I, § 8, cl. 1.  *See* Complaint, ¶ 53.  Plaintiffs' Response to the Motion to Dismiss, however, makes clear that their Uniformity Clause argument is only an aspect of their Origination Clause argument.  *See* Plaintiffs' Response [Doc. # 20],
(continued...)

## II.    APPLICABLE LEGAL STANDARDS

### A.    Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case." *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005) (citations omitted).   In considering a challenge to subject matter jurisdiction, the district court is "free to weigh the evidence and resolve factual disputes in order to satisfy itself that it has the power to hear the case." *Id.*   When the court's subject matter jurisdiction is challenged, the party asserting jurisdiction bears the burden of establishing it. *See Davis v. United States*, 597 F.3d 646, 649 (5th Cir. 2009).   A motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject matter jurisdiction. *Id.*   The Court must "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2007).

### B.    Failure to State a Claim

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is viewed with disfavor and is rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).   The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Harrington*, 563 F.3d at 147.   The complaint must, however, contain sufficient factual allegations,

---

[15]      (...continued)
          at 15.   Accordingly, the Court construes Plaintiffs' claims in their Complaint to be
          limited to the two counts that Plaintiffs explicitly advance, namely, violations of the
          Origination Clause and the Takings Clause.

as opposed to legal conclusions, to state a claim for relief that is "plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Patrick v. Wal-Mart, Inc.*, 681 F.3d 614, 617 (5th Cir. 2012).   When there are well-pleaded factual allegations, a court should presume they are true, even if doubtful, and then determine whether they plausibly give rise to an entitlement to relief. *Iqbal*, 556 U.S. at 679.   Additionally, regardless of how well-pleaded the factual allegations may be, they must demonstrate that the plaintiff is entitled to relief under a valid legal theory. *See Neitzke v. Williams,* 490 U.S. 319, 327 (1989); *McCormick v. Stalder,* 105 F.3d 1059, 1061 (5th Cir. 1997).

## III.   **JURISDICTIONAL ISSUES**

### A.   **Plaintiffs' Standing**

Defendants first argue that both Hotze and Braidwood lack standing to assert the claims alleged.   Defendants contend that Hotze lacks standing because he currently participates in Braidwood's health plan and carries health coverage[16] that makes it "very likely [Hotze] will not be subject to the tax penalty assessed under the minimum coverage provision."[17]   Defendants further contend that Braidwood lacks standing because it cannot be assessed a payment until 2015, "and whether Braidwood will be [subject to an assessable payment] turns on facts that are not pled in the complaint, including the future actions of Braidwood's employees."[18] Specifically, Defendants argue that it is "speculative whether Braidwood will owe any tax under Section 4980H" because Braidwood "will be subject to the assessable

---

[16]   *See* Complaint, ¶ 11.

[17]   Motion to Dismiss [Doc. # 14], at 8-9.

[18]   *Id.*, at 11.

payment only if at least one of its full-time employees is certified as having enrolled in a qualified health plan in an exchange and that full-time employee is allowed premium tax credits or cost-sharing reductions," and that a Braidwood employee can only receive a tax credit "if the employer-sponsored coverage offered fails to meet certain standards for adequate coverage."[19]   Defendants therefore argue that Braidwood cannot yet know whether it will be subject to an assessable payment, because it is unclear: whether Braidwood's health plan will fall short of the required standards for minimum coverage; whether a Braidwood employee will choose to obtain coverage in a health exchange; and whether an employee who does obtain coverage on an exchange will be eligible for a premium tax credit.[20]

"Standing under Article III of the Constitution requires that an injury be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010).  In addition to this "constitutional" standing requirement, a party must also show that it has "prudential" standing, which "encompasses the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked."  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  "[T]he party invoking federal jurisdiction bears the burden of

---

[19]     *Id.*

[20]     *Id.*, at 12.

establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998).

The Court agrees with Braidwood that it has standing to contest the constitutionality of the ACA under the Origination and Takings Clauses.  Braidwood has alleged an injury that is "concrete, particularized, and imminent."  Braidwood is subject to the employer mandate as an "applicable large employer" since it "has approximately 73 full-time equivalent employees."[21]  *See* 26 U.S.C. § 4980H(c)(2)(A) (defining "applicable large employer" as "an employer who employed an average of at least 50 full-time employees on business days during the preceding calendar year").  Currently, Braidwood voluntarily offers its employees a high-deductible health coverage plan and the option to contribute money to Health Savings Accounts.[22]  Funding this plan costs Braidwood approximately $198,000 per year.[23]  Braidwood alleges that it "must make decisions soon about whether to incur the new penalties imposed by [the] ACA or switch to more expensive and less desirable health insurance coverage pursuant to [the] ACA requirements."[24]  Braidwood has plausibly asserted that it must take steps now to ensure compliance with the employer mandate in 2015 and that it imminently will accrue expenses in preparing for and implementing its plan.  These allegations are sufficient, on a motion to dismiss, to meet the concrete injury requirement.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("General factual allegations of injury resulting from the defendant's

---

[21]     Complaint, ¶ 4.

[22]     *Id.*, ¶¶ 23-24.

[23]     *Id.*, ¶ 27.

[24]     *Id.*, ¶ 28.

conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.""); *see also Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 89-90 (4th Cir. 2013) (citing *Lujan* and holding that Liberty University had standing to contest the employer mandate because "[e]ven if the coverage Liberty currently provides ultimately proves sufficient, it may well incur additional costs because of the administrative burden of assuring compliance with the employer mandate, or due to an increase in the cost of care.").

Braidwood also meets the second and third elements of the constitutional standing analysis. Braidwood's injury is "fairly traceable to the challenged action;" indeed, Braidwood would not have any injury at all—at least as regards its provision of health coverage to its employees—if not for the requirements imposed by the employer mandate. And Braidwood's injury would be "redressable by a favorable ruling," which, under the claims Braidwood asserts, would require striking down all or part of the ACA as unconstitutional.

Defendants further argue that Braidwood's claims are simply "generalized grievances" for which Braidwood lacks prudential standing.[25] This argument is essentially foreclosed for the reasons the Court has determined that Braidwood has established constitutional standing to challenge the ACA on the grounds asserted. Because Braidwood suffers an actual, concrete injury under the ACA in its status as an employer subject to the employer mandate, Braidwood's claim is not "generalized," but instead is particular to it as an employer. Accordingly, Braidwood has met its burden to establish that it has standing to assert these claims.

---

[25]     Defendants' Reply [Doc. # 25], at 8. Defendants do not actually use the phrase "prudential standing" in their brief.

The Court does not separately address Hotze's standing, as it is well-settled that where one party has standing to assert the claims presented, a court does not have to "consider the standing of the other plaintiffs."[26]  *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160 (1981); *see also Florida ex rel. Attorney Gen. v. U.S. Dep't of Health and Human Servs.*, 648 F.3d 1235, (11th Cir. 2011), *aff'd in part and rev'd in part on other grounds*, *NFIB*, 132 S. Ct. 2566 (2012) (proceeding to the merits on claims contesting provisions of the ACA where "at least one plaintiff has standing to raise each claim").

## B.    **Anti-Injunction Act**

Defendants also contend that the Anti-Injunction Act ("AIA"), which provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed,"[27] 26 U.S.C. § 7421(a), precludes this Court's adjudication of Braidwood's challenges to the employer mandate.  The Court is unpersuaded.[28]  In *NFIB*, the Supreme Court ruled that the AIA does not apply to the individual mandate because Congress "chose to describe the 'shared responsibility payment' . . . not as a 'tax,' but as a 'penalty,'" in contrast to "many other exactions [the ACA] creates as 'taxes.'"  *NFIB*, 132 S. Ct. at 2583.  Thus, even though the Supreme Court ultimately upheld the law under Congress's taxing power, the Court

---

[26]    Only two claims are before the Court: (1) whether the ACA originated in the Senate in violation of the Origination Clause; and (2) whether payments under the ACA are "takings" under the Fifth Amendment.  Both Plaintiffs assert both claims before this Court.

[27]    Motion to Dismiss [Doc. # 14], at 13.

[28]    The AIA does not preclude the Court's review of Plaintiff Hotze's challenges to the individual mandate.  *See NFIB*, 132 S. Ct. at 2582-84.

reasoned that both "[t]he Anti-Injunction Act and the Affordable Care Act . . . are creatures of Congress's own creation," and a review of the statutory text that Congress promulgated led the Court to conclude that Congress had not intended the individual mandate to be subject to the AIA.  *Id.* at 2583-84.

Defendants argue that the employer mandate should be treated differently from the individual mandate.  Defendants cite to various provisions of the ACA that refer to the employer mandate as a "tax."[29]  Accordingly, Defendants reason that because Congress was more explicit in referring to the employer mandate as a tax, it stands to reason, under *NFIB*, that the mandate should be subject to the AIA.[30]

The Court is not persuaded by Defendants' distinction between the employer mandate and the individual mandate.  The ACA does, at times, refer to the employer mandate as a "tax."  *See, e.g.*, 42 U.S.C. § 18081(f)(2)(A); 26 U.S.C. § 4980H(b)(2); 26 U.S.C. § 4980H(c)(7).  In other instances, however, the ACA refers to the employer mandate as an "assessable payment," *see, e.g.*, 26 U.S.C. § 4980H(b)(1), (c)(2)(D)(i)(I), (d)(1), (d)(2), (d)(3), or an "assessable penalt[y]," 26 U.S.C. § 4780H(c)(2)(D).  Thus, Congress' phrasing regarding the employer mandate is ambiguous, at best, with regard to it being a "tax" within the meaning of the AIA.  As the Supreme Court in *NFIB* emphasized, "penalties" located in subchapter 68B of the Internal Revenue Code "are treated as taxes under Title 26," but the individual mandate was "not in subchapter 68B of the Code."  *NFIB*, 132 S. Ct. at 2583.  The same is true for the employer mandate.  *See Liberty Univ.*, 733 F.3d at 88.

The Court agrees with the Fourth Circuit's observation in *Liberty University*

---

[29]      *Id.*, at 14-15.

[30]      *See id.* at 15-16.

that "to adopt the [Defendant's] position" that the employer mandate, unlike the individual mandate, is subject to the AIA "would lead to [the] anomalous result" that an individual could bring a pre-enforcement challenge to the individual mandate but an employer could not assert such a challenge to the employer mandate. *Id.* Defendants here disagree with the *Liberty University* Court on the grounds that the employer mandate, unlike the individual mandate, can be enforced through certain "summary administrative measures," such as "by levies and the filing of notices of liens."[31] Despite this distinction, the Fourth Circuit noted, "[i]t seems highly unlikely that Congress meant to signal . . . that the mandates should be treated differently for purposes of the AIA's applicability." *Id.* These mandates serve similar purposes, albeit for different "persons" under the law, and it seems unlikely that the employer mandate should be subject to the AIA simply because Congress provided the Internal Revenue Service with expanded methods to collect taxes from employers who choose to pay the tax in lieu of providing health coverage to employees. The Court declines to import a distinction between the mandates with regard to the applicability of the AIA and follows the Supreme Court and Fourth Circuit's leads that the AIA does not deprive this Court of jurisdiction over Braidwood's claims.

## C.   Ripeness

Defendants' final procedural argument for dismissal is that this Court is without jurisdiction to adjudicate Braidwood's claim that claim is not yet ripe.[32] Essentially, Defendants argue that Braidwood cannot sustain an injury until the employer mandate goes into effect—that is, in 2015—and that "Braidwood [cannot]

---

[31]   Motion to Dismiss [Doc. # 14], at 15-16; Defendants' Reply [Doc. # 25], at 10-11.

[32]   Defendants do not contest the ripeness of Hotze's claims.

establish with any reliability that it will be subject to the tax assessment associated with the provision at that time."[33]   Braidwood, in opposition, argues that it will imminently be subject to the employer mandate,[34] that the claims here are "purely legal," and that application of the mandate requires Braidwood to "incur additional costs in order to make it ACA-compliant," costs Braidwood must incur now in order to prepare for the mandate and "to attract and retain employees" subject to the individual mandate.[35]

"[The] ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."   *Reno v. Catholic Soc. Servs.*, 509 U.S. 43, 58 n.18 (1993) (citing *Buckley v. Valeo*, 424 U.S. 1, 114 (1976)).   The purpose of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements."   *Choice Inc. of Texas v. Greenstein*, 691 F.3d 710, 715 (5th Cir. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).   In considering a ripeness objection, a court should consider "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."   *Id.*

---

[33]   Motion to Dismiss [Doc. # 14], at 17.

[34]   Plaintiffs, in essence, argue that despite the fact that the employer mandate will not go into effect until 2015, it is clear *as of now* that the mandate will go into effect (and that taxes will be imposed), and that delay in deciding the constitutionality of this provision will only hurt Plaintiffs, while reviewing the law's constitutionality now will leave Defendants unharmed.  Plaintiffs' Response [Doc. # 20], at 10.

[35]   *Id.*, at 10-11.  Braidwood suggests that the plan it currently offers is not "ACA-compliant," so it must switch its plan now both to ensure compliance with the ACA (at least as of 2015) and to ensure that its employees (or possible future employees), who are subject to the individual mandate, receive insurance that would allow them to comply individually with the ACA.

Ripeness inquiries are particularly important in cases where a plaintiff seeks "*pre-enforcement* review of a law or regulation." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 544 (5th Cir. 2008) (emphasis in original).  While cases involving purely legal issues are generally ripe for consideration, a plaintiff must still "show some hardship in order to establish ripeness." *Choice Inc. of Texas*, 691 F.3d at 715.

The Court concludes that Braidwood's claims are ripe for consideration.  First, the claims at bar are fit for judicial decision.  Braidwood's claims are essentially "pure legal questions," one contesting the entire ACA under the Origination Clause and the other challenging the employer mandate under the Takings Clause of the Fifth Amendment.  In order to be adjudicated, neither claim requires detailed factual development regarding Braidwood's health coverage obligations.  The Court concluded above that Braidwood has Article III standing to assert its claims.[36]  The Supreme Court has opined that fitness for decision depends, at least in part, on whether the claim involves "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985) (citing 13A C. Wright, A. Miller & E. Cooper, FEDERAL PRACTICE AND PROCEDURE § 1352 (1984)).  Here, "there is some risk that circumstances could change between the time this complaint was filed" and 2015, the deadline for application of the employer mandate.  *Ass'n of Amer. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 37 (D.D.C. 2012).  But the risk appears quite small, given that the Supreme Court has upheld the constitutionality of the individual mandate in *NFIB*, the fact that the individual mandate itself has already

---

[36]     *See supra* Part III.A.

gone into effect, and, as detailed below,[37] that the employer mandate relies on a similarly sound constitutional basis.  *See id.*

Second, Braidwood would suffer hardship if the decision were delayed on these issues.  "The Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being forced . . . to modify one's behavior in order to avoid future adverse consequences."  *Choice Inc. of Texas*, 691 F.3d at 715 (internal quotations omitted).  Braidwood contends that its current health coverage plan does not comply with the requirements of employer health plans under the ACA, and that it will need to incur costs in order to comply.[38]  Moreover, Braidwood asserts that it must do so now in order to retain current employees or attract future employees who themselves are subject to the individual mandate.[39]  While any direct payment under the employer mandate would not be assessed until 2015, Braidwood must already bear these incidental costs and is being "harmed" by the mandate.  Accordingly, Braidwood has sufficiently shown the required hardship in order to permit pre-enforcement judicial review of its claims.  *See Roark*, 522 F.3d at 545-46 (holding that a bar would suffer hardship without pre-enforcement review of an ordinance requiring the bar to take "necessary steps to prevent or stop another person from smoking in an enclosed area in a public place," where the bar would be required to "guess the requirements of the . . . provision" to implement and where failure to do so could subject the bar to a fine or revocation of licenses); *Ass'n of*

---

[37]     *See infra* Parts IV and V.

[38]     Plaintiffs' Response [Doc. # 20], at 11.

[39]     *Id.*

*Amer. Physicians*, 901 F. Supp. 2d at 37 (finding challenge to individual mandate ripe where "individuals who will be affected by this provision will need to start preparing in advance of the date it actually takes effect").

Moreover, the Court notes that during the litigation challenging the individual mandate that preceded the Supreme Court's decision in *NFIB*, at least one Court of Appeals that considered the ripeness issue found the challenge ripe for judicial decision. *See, e.g.*, *Thomas More Law Center v. Obama*, 651 F.3d 529, 537-38 (6th Cir. 2011), *cert. denied*, 133 S. Ct. 61 (2012), *and abrogated on other grounds by NFIB*, 132 S. Ct. 2566 (2012) (finding Article III ripeness because the case concerned a "pre-enforcement facial challenge" to the individual mandate and the fact that "[b]y permitting this lawsuit to be filed three and one-half years before the effective date . . . the only thing that changes is that all three layers of the federal judiciary will be able to reach considered merits decisions . . . before the law takes effect"). The same logic applies to the employer mandate. Braidwood asserts a pre-enforcement facial challenge to the law under the Origination Clause and the Takings Clause. No recognized principle of federal jurisdiction will be served by delaying decision on this issue until 2015, when assessable payments under the employer mandate will commence for employer non-compliance. Given the choice between allowing for a full and thorough consideration of the issues by various levels of the judiciary at this time or requiring "rushed interim decisions" at some later point, "[t]he former is certainly preferable to the latter." *Id.* at 538.

## IV.   <u>ORIGINATION CLAUSE</u>

The Origination Clause provides that "[a]ll Bills for raising Revenue shall originate in the House of Representatives; but the Senate may propose or concur with Amendments as on other Bills." U.S. Const. art. I, § 7, cl. 1. The jurisprudence on

the Origination Clause is sparse but informative, and that precedent guides this Court's decision of Plaintiffs' Origination Clause challenge to the ACA.

To state a claim for the violation of the Origination Clause, a plaintiff must show that each element of the Clause has been breached.  First, the plaintiff must show that the bill in question is one "for raising revenue."  Second, the plaintiff must prove that the bill "did not originate in the House of Representatives."  *See Sissel v. U.S. Dep't of Health and Human Servs.*, __ F. Supp. 2d __, 2013 WL 3244826, at *6 (D.D.C. June 28, 2013); *see also Twin City Nat'l Bank of New Brighton v. Nebecker*, 167 U.S. 196, 202-03 (1897) (holding that bill was not one for raising revenue, and thus finding it unnecessary to reach the question of whether the bill "originated in the one body or the other"); *see generally United States v. Munoz-Flores*, 495 U.S. 385 (1990) (analyzing whether challenged statute was a "Bill[] for raising Revenue"); *Flint v. Stone Tracy Co.*, 220 U.S. 107 (1911), *overruled on other grounds by Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985) (analyzing whether challenged statute originated in the House of Representatives).[40]

Judge Beryl Howell of the United States District Court for the District of Columbia has recently considered, and rejected, the argument that the ACA was passed in violation of the Origination Clause.  *See Sissel*, 2013 WL 3244826, at *6-12.  This Court finds much of Judge Howell's reasoning persuasive and, for similar reasons, rejects Plaintiffs' challenge to the ACA on Origination Clause grounds.

## A.    The ACA is not a "Bill for raising Revenue"

Plaintiffs contend that certain provisions of the ACA—namely, the individual mandate and the employer mandate—"levy taxes in the strict sense of the word" and

---

[40]    The Supreme Court has held that Origination Clause challenges to a law are justiciable.  *See generally United States v. Munoz-Flores*, 495 U.S. 385 (1990).

thus "raise revenue" under the Origination Clause.[41]  In support of this contention, Plaintiffs note that funds raised through these mandates "go into the Treasury" and not into any distinct, healthcare-oriented (or other regulatory) program.[42]  Plaintiffs assert that these provisions of the ACA essentially create "a massive, multi-billion-dollar *income* tax."[43]  In support of their position, Plaintiffs cite three Supreme Court cases that address the Origination Clause.[44]

In its Origination Clause jurisprudence, the Supreme Court has paid particular attention to the overarching purpose of the challenged bills.  Bills covered by the Origination Clause "are those that levy taxes in the strict sense of the word, and are not bills for other purposes which may incidentally create revenue."  *Nebecker*, 167 U.S. at 202-03 (citing 1 Joseph Story, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 880 (1833)).  The Supreme Court has rejected Origination Clause challenges on the grounds that a bill imposed a tax that only "incidentally" created revenue.  For example, the *Nebecker* Court held that a tax imposed on certain banking associations was not a revenue bill because it was only "a means for effectually accomplishing the great object of giving to the people a currency that would rest primarily upon the honor of the United States . . . . There was no purpose by the act, or by any of its provisions, to raise revenue to be applied in meeting the expenses or

---

[41]     Plaintiffs' Response [Doc. # 20], at 14.

[42]     *Id.*, at 14-15.

[43]     *Id.*, at 16 (emphasis in original).

[44]     *See id.*, at 14-17 (citing *United States v. Munoz-Flores*, 495 U.S. 385 (1990); *Millard v. Roberts*, 202 U.S. 429 (1906); *Twin City Nat'l Bank of New Brighton v. Nebecker*, 167 U.S. 196 (1897)).  It is noted that none of these decisions held there was a violation of that clause.

obligations of the government."[45]  *Nebecker*, 167 U.S. at 203.  In *Millard v. Roberts*, the Supreme Court held that a tax imposed on District of Columbia property owners to help fund infrastructure to be used by private railroad corporations was not a revenue bill because that tax was "but means to the purposes provided by the act." 202 U.S. 429, 437 (1906).  And in *United States v. Munoz-Flores*, the Supreme Court held that a "special assessment" imposed on people convicted of misdemeanors was "passed as part of a particular program to provide money for that program—the Crime Victims Fund," and therefore was not a "bill for raising revenue," even where the excess money collected was paid into the General Treasury.  495 U.S. 385, 398-400 (1990).  In short, the Supreme Court has consistently interpreted the phrase "raising revenue" narrowly to apply only to those bills, or provisions of bills, whose *primary purpose* is the collection of revenue.  *See Sissel*, 2013 WL 3244826, at *7 ("Under the Supreme Court's precedents—sparse as they may be on this subject—so long as the primary purpose of the provision is something other than raising revenue, the provision is not subject to the Origination Clause.").

The Fifth Circuit's Origination Clause jurisprudence—though limited—also supports the notion that the "revenue raising" provisions of an act must be evaluated by looking at the act's larger purpose.  In *United States v. Herrada*, 887 F.2d 524 (5th Cir. 1989), the Court of Appeals addressed the provision—the "special assessment" imposed under 18 U.S.C. § 3013—at issue in *Munoz-Flores.*  The Court of Appeals, reaching the same conclusion that the Supreme Court ultimately reached a year later, reasoned that:

> Section 3013 was but a subsidiary element of a comprehensive

---

[45]   The Court notes that the tax imposed in the bill at issue in *Nebecker* was paid to the "treasurer of the United States."  *Nebecker*, 167 U.S. at 199.

Congressional scheme aimed at aiding the victims of crime.   The purpose of the Act was not the prohibited purpose of raising revenue 'to be applied in meeting the expenses or obligations of the government.'

*Id.* at 527.   Indeed, the Court of Appeals explained that the Supreme Court's precedents "instruct us to consider the *overarching purpose* of an Act when one of its provisions is subject to an Origination Clause challenge."   *Id.* at 528 (emphasis added).[46]   Thus, the fact that tax revenue gained through the ACA's provisions is directed to the "general Treasury"—the crux of Plaintiffs' Origination Clause argument—is not sufficient to qualify the ACA as a "bill for raising revenue." Plaintiffs correctly note a distinguishing feature of this case from past decisions, such as *Nebecker*, *Millard*, and *Munoz-Flores*, that the assessments under the ACA are paid to the Treasury and are not required to be used to fund particular programs created by the legislation.[47]   *See Munoz-Flores*, 495 U.S. at 399.   But the use of revenue is only one method of assessing the "purpose" of the provision.   In determining the primary purpose of the ACA, the Court may also assess whether the

___

[46]     Plaintiffs argue that "speculation about a legislative purpose . . . is contrary to Fifth Circuit teachings that the plain meaning of a statute trumps assertions of legislative intent."   Plaintiffs' Response [Doc. # 20], at 20.   Plaintiffs, however, conflate different ways in which background legislative materials may be used.   The Fifth Circuit has in *dicta* rejected the use of "legislative intent" in interpreting the meaning of particular provisions of a statute.   *See id.* (citing *Andrepont v. Murphy Exploration & Prod. Co.*, 566 F.3d 415, 420-21 (5th Cir. 2009)).   Discernment of "legislative intent," however, is distinct from ascertaining legislative "purpose" to determine whether a statute complies with certain Constitutional requirements, such as the Origination Clause.   The Fifth Circuit's own precedent, as cited above, "instructs" that legislative "purpose" should be used in the latter circumstance.   Moreover, the Supreme Court has noted that the "purpose" of the individual mandate is apparent on the face of the statute.   *See NFIB*, 132 S. Ct. at 2596 (noting that the individual mandate is "plainly designed to expand health insurance coverage").

[47]     Plaintiffs' Response [Doc. # 209], at 15.

law "raises revenue to support Government generally," *Munoz-Flores*, 495 U.S. at 398, and whether "[t]he tax was a means for effectually accomplishing" a purpose distinct from raising revenue "to be applied in meeting the expenses or obligations of the government," *Nebecker*, 167 U.S. at 203.  *See Sissel*, 2013 WL 3244826, at *7.

The ACA, by and through the individual mandate and employer mandate, is "plainly designed to expand health insurance coverage." *NFIB*, 132 S. Ct. at 2596. These mandates, in other words, are but a means to an end, which is to advance health care coverage.  *See, e.g.*, Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1501(a)(2)(C) ("The [minimum essential coverage] requirement, together with other provisions of this Act, will add millions of new consumers to the health insurance market, increasing the supply of, and demand for, health care services.").[48] Their goal is not to "support Government generally."  Indeed, while individuals have the free choice whether to purchase insurance or pay an assessment, which has been characterized as a tax, Congress's purpose clearly was to "induce the purchase of health insurance." *See NFIB*, 132 S. Ct. at 2596-97.   Congress's preference is undoubtedly that individuals purchase insurance in lieu of paying the tax, and thus for "the individual mandate to raise zero revenues." *Sissel*, 2013 WL 3244826, at *8.

---

[48]     The text of the ACA does not expressly state the purpose of the employer mandate, as the statute does for the individual mandate.  In certain legislative history, in addition to the quote in the parenthetical in the text above, Congress expressed that the employer mandate also served the broader purpose of expanding and stabilizing the American health insurance market.  *See* H.R. Rep. No. 111-443(II), at 985-86 ("The employer responsibility to provide and/or contribute to the health care of its workers will stabilize the employer-based health care system.  Because the Employee Retirement Income Security Act of 1974 (ERISA) currently contains no requirement that an employer offer employee benefits, employers who do not offer health insurance to their workers gain an unfair economic advantage relative to those employers who do provide coverage, and millions of hard-working Americans and their families are left without health insurance.").

The same is true for the employer mandate, which also serves to expand health care coverage.[49]   While some revenue under these mandates will be paid to the general Treasury, those payments are only "incidental" to the ACA's "overarching purpose." *See Munoz-Flores*, 495 U.S. at 399-400 (holding that "special assessment" collected in misdemeanor convictions was only "incidental" to the purpose of "generating needed income to offset the cost of the Crime Victims Fund"); *Nebecker*, 167 U.S. at 203 (holding that tax imposed on banking associations was only a "means for effectually accomplishing the great object" of creating a national currency).[50]

---

[49]    *See* Motion to Dismiss [Doc. # 14], at 29 ("Indeed, the very purpose of the employer responsibility provision is to encourage applicable large employers to provide sufficient health coverage and thus to avoid paying the associated tax.   As with Section 5000A, Section 4980H will thus operate most successfully by generating even less revenue.").

[50]    Plaintiffs primarily argue as to the Origination Clause that the ACA is a "massive, multi-billion-dollar *income* tax," making it a revenue bill subject to that clause. Plaintiffs' Response [Doc. # 20], at 16 (emphasis in original).  Plaintiffs also seek to frame the ACA as "a government-mandate redistribution of wealth" because "the persons paying the taxes under ACA are unrelated to those receiving the benefits." *Id.*, at 18-19.   These arguments, however, do not address the crux of the issue—whether Congress's purpose in enacting the individual mandate or the employer mandate was primarily to raise revenue, rather than to induce the purchase of and broaden the number of people receiving health care coverage. Plaintiffs' first argument (*i.e.*, that the ACA is an income tax) conflates the concept of "taxes" with "bills for raising revenue."   While there is undoubtedly overlap between the two concepts, the Government can impose taxes whose primary purpose is not the raising of revenue. *See NFIB*, 132 S. Ct. at 2596 ("But taxes that seek to influence conduct are nothing new . . . . That § 5000A seeks to shape decisions about whether to buy health insurance does not mean that it cannot be a valid exercise of the taxing power.").  Plaintiffs' second argument seeks to interpose a purpose to the law that is found neither in the statutory text nor in the legislative history.  Moreover, Plaintiffs provide no support for their proposition that the supposed "redistributive" aspect of the mandates makes those provisions constitutionally suspect under the Origination
(continued...)

Accordingly, neither the ACA as a whole nor the individual and employer mandates *per se* within the act are a "Bill[] for raising Revenue" subject to the Origination Clause.

### B.   The ACA Originated in the House of Representatives

Alternatively, to the extent that the ACA is a "Bill[] for raising Revenue," the ACA originated in the House of Representatives.  Plaintiffs do not argue in response to the Motion to Dismiss how this H.R. 3590 originated in the Senate; instead, Plaintiffs here again focus on whether the ACA "raises revenue within the meaning of the Origination Clause."[51]  Accordingly, the Court concludes that Plaintiffs have abandoned the theory that the bill did not originate in the House as a basis for striking down the ACA on Origination Clause grounds.

Even if Plaintiffs were deemed not to have abandoned this argument because they allege in their Complaint that "[*a*]*s amended in the Senate*, ACA is a revenue-raising bill that did not originate with a revenue-raising bill in the House . . .,"[52] the argument fails.  More specifically, the Court addresses the contention that the version of H.R. 3590 that originated in the House was effectively superseded by the Senate's "creation" of the ACA, and thus the ACA, though nominally titled under H.R. 3590, originated in the Senate.[53]  The Court finds this argument unpersuasive.

---

[50]      (...continued)
Clause.

[51]      Plaintiffs' Response [Doc. # 20], at 14.

[52]      Complaint, ¶ 51.

[53]      Some scholars have referred to this as a "shell bill."  *See* Rebecca M. Kysar, *The 'Shell Bill' Game: Avoidance and the Origination Clause*, 91 WASH. U. L. REV. __ (forthcoming 2014).  The Court finds it important to address this argument, though
(continued...)

This contention ignores the second half of the Origination Clause, which states that "the Senate may propose or concur with Amendments as on other bills." U.S. CONST. art. I, § 7, cl. 1. Significantly, the Supreme Court has upheld against an Origination Clause challenge a law in which the Senate struck a provision of a House bill regarding taxes and inserted a new provision of its own. *See Flint*, 220 U.S. at 143 (rejecting Origination Clause challenge where Senate's amendment inserted a corporation tax in place of an inheritance tax).[54] There, the Supreme Court stated:

> This statement shows that the tariff bill of which the section under consideration is a part, originated in the House of Representatives, and was there a general bill for the collection of revenue . . . The bill having properly originated in the House, we perceive no reason in the constitutional provision relied upon why it may not be amended in the Senate in the manner which it was in this case. The amendment was germane to the subject-matter of the bill, and not beyond the power of the Senate to propose.

*Id.* Subsequent Courts of Appeals, including the Fifth Circuit, have endorsed this Congressional practice even where the Senate substitutes the entire text of a House-originated bill with its own text. *See, e.g.*, *Texas Ass'n of Concerned Taxpayers, Inc. v. United States*, 772 F.2d 163 (5th Cir. 1985), *cert. denied*, 476 U.S. 1151 (1986) (affirming, in *dicta*, the lower court's dismissal of an Origination Clause challenge where, "[u]pon reaching the Senate, [a House bill] was referred to the Senate Finance Committee, which struck the entire text of the bill after the enacting clause and

---

[53]    (...continued)
abandoned, because it grants Defendants' Motion to Dismiss without leave to amend, and recognizes that, in an amended pleading, Plaintiffs may have reasserted this argument.

[54]    The Supreme Court also held that the "plan for inheritance taxation" which originated in the House "was there a general bill for the collection of revenue." *Flint*, 220 U.S. at 143.

replaced it with a massive tax-increasing proposal," on the grounds that, under *Flint*, the Senate's amendment was permissible); *Armstrong v. United States*, 759 F.2d 1378 (9th Cir. 1985) (stating that "once a revenue bill has been initiated in the House, the Senate is fully empowered to propose amendments," even when those amendments are "far-reaching and extensive").  The Senate's amendment power, in other words, is broad in scope, even where those amendments leave the original House-originated legislation as nothing more than a "shell bill."

One limitation courts have considered, but not found dispositive, is whether the Senate's amendment was "germane" to the subject of the House bill.  *See Flint*, 220 U.S. at 143 ("The amendment was germane to the subject-matter of the bill, and not beyond the power of the Senate to propose."); *Texas Ass'n of Concerned Taxpayers,* 772 F.2d at 168 ("The Senate's amendment, adding new taxes, was germane to the subject matter and thus within the range of amendments permitted by the origination clause.").  The Origination Clause itself does not require "germaneness," and it is unclear whether any of the cited cases *actually* impose such a requirement.  *See Sissel*, 2013 WL 3244826, at *10 (reading *Flint* to conclude that it is "sufficient," but not necessary, "to comport with the Origination Clause when a Senate amendment to a House revenue bill is germane to the subject-matter of the bill").  Moreover, the Origination Clause allows the Senate to amend a House a bill that raises revenue "as on other bills."  U.S. Const. art. I, § 7, cl. 1.  There can be no dispute that, generally speaking, the Senate is not limited by a germaneness requirement in amending House-originated legislation.  Thus, it is likely that the Origination Clause does not impose a "germaneness" requirement either.  Nevertheless, because the issue is not free from doubt, the Court assumes that the Senate's amendment to a revenue bill must be germane, at some level of generality, to the topic of the House bill, and holds that the

ACA satisfies this requirement.[55]

Both *Flint* and *Texas Association of Concerned Taxpayers* adopted "a very loose conception of germaneness." *Sissel*, 2013 WL 3244826, at *12. In *Flint*, the Supreme Court found the Senate's substitution of a corporation tax bill in place of an inheritance tax provision was germane for Origination Clause purposes. *See Flint*, 220 U.S. at 143. Similarly, in *Texas Association of Concerned Taxpayers*, the Fifth Circuit found that the Senate's amendment that *raised* taxes on certain conduct or businesses was germane to a House bill that *cut* taxes without regard to the source of the revenue. *See Texas Ass'n of Concerned Taxpayers,* 772 F.2d at 168. The unifying principle in these cases is that a Senate amendment to a bill that "raises revenue" is germane so long as the original House bill related to tax or revenue

---

[55]   The *Sissel* Court held that the issue of "germaneness" was not justiciable. *See Sissel*, 2013 WL 3244826, at *11 (citing *Rainey v. United States*, 232 U.S. 310 (1914)) ("The Supreme Court's statement that 'it is not for this court to determine whether the amendment was or was not outside the purposes of original bill' strongly suggests that it is for Congress, not the courts, to decide whether an amendment is properly germane in any given case."). The *Sissel* Court concluded that while *Munoz-Flores* made Origination Clause challenges themselves justiciable in federal court, it did not address the germaneness issue, and that a proper reading of that decision, and other Supreme Court and D.C. Circuit decisions, indicated that justiciability "likely stops short of permitting scrutiny of whether a Senate amendment to a revenue bill is germane." *Id.* This Court does not read *Munoz-Flores* so narrowly. While the Supreme Court's Origination Clause analysis in that case was limited to whether the contested bill was one for raising revenue, the first half of its opinion—devoted to the justiciability issue—is not so limited. Indeed, the Court there stressed that "the law must comply with *all* relevant constitutional limits" and that "[a] law passed in violation of the Origination Clause would thus be no more immune from judicial scrutiny because it was passed by both Houses and signed by the President than would be a law passed in violation of the First Amendment." *Munoz-Flores*, 495 U.S. at 397. To the extent that the Constitution requires "germaneness" under the Origination Clause, the Court is required, under *Munoz-Flores*, to examine the Senate amendment in light of the original House bill to see if this requirement has been met.

issues.

In this light, the ACA is germane to H.R. 3590 as originally drafted in the House. The ACA passed the House and the Senate, and was signed by the President, as H.R. 3590.[56] The bill that originated in the House on October 8, 2009, entitled the "Service Members Home Ownership Tax Act of 2009," included both revenue-raising and revenue-decreasing provisions. Indeed, the entirety of that bill concerned revenue. The ACA, a much longer bill, included provisions that were revenue-raising (such as the individual and employer mandates) and provisions which did not touch on revenue at all. Because both versions of the bill concerned revenue, any applicable germaneness requirement is met here. *See Sissel*, 2013 WL 3244826, at *12. That the sources of revenue generated by the ACA mandates differ from those originally proposed under the House bill is of no import in this analysis, as both *Flint* and *Texas Association of Concerned Taxpayers* make clear. Accordingly, even if the

---

[56]    Defendants contend that "the ACA's compliance with the Origination Clause is underscored by the House's acceptance of the Senate's amendment," since the House has the ability to independently enforce the Origination Clause through the "blue-slipping" procedure. Motion to Dismiss [Doc. # 14], at 29-30. The Supreme Court rejected a similar argument in *Munoz-Flores*, noting that "congressional consideration of constitutional questions does not foreclose subsequent judicial scrutiny of the law's constitutionality." *Munoz-Flores*, 495 U.S. at 391. While the House's enactment of the Senate's version of H.R. 3590 demonstrates the House concurred in the Senate's provisions, the House's enactment does not address the issue of which body originated the legislation. The Court notes, however, that the "H.R." designation on the enrolled bill here does carry some weight in assessing where the bill originated. *Cf. id.* at 409 (Scalia, J., dissenting) ("[F]ederal courts should not undertake an independent investigation into the origination of the statute at issue here. The enrolled bill which, when signed by the President, became the Victims of Crime Act of 1984, 98 Stat. 2170, bore the indication 'H.J. Res. 648.'. . . The enrolled bill's indication of its House of origin establishes that fact as officially and authoritatively as it establishes the fact that its recited text was adopted by both Houses . . . [The Court] should similarly accept the congressional representation in the present case.").

ACA and the mandate provisions are "Bills for raising Revenue," H.R. 3590 originated in the House and was later amended in a manner "germane" to the original bill. Plaintiffs' arguments to the contrary are rejected and their claim of violation of the Origination Clause is dismissed.

## V.   TAKINGS CLAUSE

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. Plaintiffs allege that the "ACA constitutes a 'taking' . . . because ACA compels Plaintiffs to pay money to other private entities: government-approved health insurance companies."[57]   This, Plaintiffs allege, violates the Fifth Amendment "by compelling private individuals and entities to make payments to other private entities, without a public use and without just compensation."[58]   In support of this allegation, Plaintiffs argue that though the ACA[59]—that is, the individual mandate—is constitutional under the Government's taxing power, the taxing power cannot be used in a manner that violates another constitutional provision, such as the Takings Clause.[60]   Plaintiffs contend that, in purchasing or providing insurance under the

---

[57]   Complaint, ¶ 58.

[58]   *Id.*, ¶ 60.

[59]   As in their Complaint, Plaintiffs here consistently refer to the ACA generally and not to particular provisions of the ACA. *See* Plaintiffs' Response [Doc. # 20], at 22-25. Many provisions of the ACA, however, do not involve the Government's taxing power and thus are not relevant to Plaintiffs' argument. The Court construes Plaintiffs' argument to relate to the individual mandate and the employer mandate, the two provisions most relevant to their claim. *See id.*, at 23 (referring to "ACA's tax penalties").

[60]   *Id.*, at 23.

individual mandate or the employer mandate, they would "pay higher premiums to subsidize both private insurance companies and ACA's favorable treatment of those with pre-existing conditions," and would therefore "not get a fair approximation of the cost of the benefits supplied."[61]

The Court is unpersuaded.   Just last term, the Supreme Court stated unequivocally that "it is beyond dispute that taxes and user fees . . . are not takings." *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2600 (2013) (citing Justice Scalia's dissent in *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 242 n.2 (2003)).   That principle is dispositive in this case.   As noted, the Supreme Court in *NFIB* upheld the individual mandate as a "tax."   *See NFIB*, 132 S. Ct. at 2593-2600. While the Supreme Court did not consider the constitutionality of the employer mandate, the Court's reasoning in *NFIB* is equally applicable to that provision, which also must be deemed a "tax."   Provisions of the ACA dealing with the employer mandate refer to that mandate as a tax.[62]   *See, e.g.*, 42 U.S.C. § 18081(f)(2)(A) ("The Secretary shall establish a separate appeals process for employers who are notified under subsection (e)(4)(C) that the employer may be liable for a tax imposed by section 4980H of Title 26 with respect to an employee because of a determination that the employer does not provide minimum essential coverage through an employer-sponsored plan . . .."); 26 U.S.C. § 4980H(b)(2) (referring to the "aggregate amount of tax determined under paragraph (1)"); 26 U.S.C. § 4980H(c)(7) (referring to "denial of deduction for the tax imposed by this section").   Moreover, "[t]he requirement to pay is found in the Internal Revenue Code and enforced by the IRS."

---

[61]      *Id.*

[62]      This Court adopts the distinctions articulated by Chief Justice Roberts in *NFIB* regarding the individual mandate being a tax but not subject to the AIA.

*NFIB*, 132 S. Ct. at 2594.  Perhaps most importantly, the employer mandate also contains "the essential feature of any tax: it produces at least some revenue for the Government."  *Id.*

The Fourth Circuit, the single Court of Appeals to have addressed the constitutionality of the employer mandate, similarly concluded that the employer mandate was constitutional as a tax, under the Supreme Court's analysis in *NFIB*.  *See Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 95-98 (4th Cir. 2013), *cert. denied* __ S. Ct. __, 2013 WL 4811562, at *1 (Dec. 2, 2013) (concluding that the employer mandate can be upheld as a tax).[63]  While the constitutionality of the employer mandate under Congress's taxing power is not presented in this case (as it was in *Liberty University*), and thus the Court does not reach that issue, the Court does conclude, for present purposes, that the employer mandate functions as a tax and thus is not unconstitutional under the Takings Clause.

Moreover, striking down either the individual mandate or the employer mandate as unconstitutional under the Takings Clause would fly in the face of the Supreme Court's decision in *NFIB*.  As noted, the Supreme Court concluded that the individual mandate was constitutional under Congress's taxing power.  For the reasons set forth above, the employer mandate also is constitutional.  To permit Congress to tax certain conduct (*i.e.*, the failure to purchase or provide health coverage), but then to require Congress to provide "just compensation" because the collection is a "taking," would render Congress's taxing authority nugatory.  *See Ass'n of Amer. Physicians*, 901 F. Supp. 2d at 38 ("[I]f the government were

---

[63]   The Fourth Circuit also noted that, like the individual mandate, the employer mandate is not a "penalty" because it "does not punish unlawful conduct," but instead leaves employers with the choice of either providing health coverage or paying the tax. *Liberty Univ.*, 733 F.3d at 98.

prohibited from using tax money for the benefit of the American people, or if it was required to give the money back, its taxation powers would be useless."). Plaintiffs have supplied no limiting principle here that would reconcile this tension.

The *NFIB* Court noted that "[e]ven if the taxing power enables Congress to impose a tax on not obtaining health insurance, any tax must still comply with other requirements in the Constitution." *NFIB*, 132 S. Ct. at 2598. Plaintiffs point this Court to *Brushaber v. Union Pacific Railroad Company*, 240 U.S. 1 (1916), to support the proposition that Congress's taxing power must be limited by the Takings Clause.[64] But Plaintiffs misread that case. In *Brushaber*, the Court *rejected* an argument that an income tax provision was unconstitutional under the Fifth Amendment, stating:

> [I]t is equally well settled that [the Due Process Clause of the Fifth Amendment] is not a limitation upon the taxing power conferred upon Congress by the Constitution; in other words, that the Constitution does not conflict with itself by conferring, upon the one hand, a taxing power, and taking the same power away, on the other, by the limitations of the due process clause.

*Id.* at 24. *Brushaber* stands for the proposition that the Fifth Amendment cannot be read to limit Congress's taxing power, *not* that the Fifth Amendment serves as a limitation on that power. *Brushaber* did state that this doctrine "would have no application in a case where . . . a seeming exercise of the taxing power" is really "*so arbitrary* as to constrain to the conclusion that it was not the exertion of taxation, but a confiscation of property; that is, a taking of the same in violation of the 5th Amendment." *Id.* at 24-25 (emphasis added). That limitation, however, is inapplicable to this case, where the Supreme Court already has determined that

---

[64]     Plaintiffs' Response [Doc. # 20], at 22-23.

"Congress had the power to impose the exaction in [the individual mandate] under the taxing power," *NFIB*, 132 S. Ct. at 2598, and the employer mandate meets the same criteria for a constitutional tax.  In sum, because the taxes challenged here are permissible and not "arbitrary," the Takings Clause cannot be read as a limitation on the power to impose those taxes.  *See also Ass'n of Amer. Physicians*, 901 F. Supp. 2d at 38-39 (rejecting application of *Brushaber's* limiting principle).

Finally, Plaintiffs argue that even though Congress has the "power to tax," it "lacks the power to use taxation to compel private citizens to transfer their money to other private entities."[65]   This argument is foreclosed by *NFIB*, which upheld Congress's "use of the Taxing Clause to encourage buying [individual health coverage]." *NFIB*, 132 S. Ct. at 2599.  In other words, under the reasoning of *NFIB*, Congress has authority to use its taxing power to incentivize the purchase of individual health coverage from private entities.  Congress similarly can incentivize employers to provide health coverage to its employees through its taxing power. Plaintiffs are not "compelled" to "transfer their money to other private entities."  As the Supreme Court stressed, Plaintiffs are free "to do or not do a certain act, so long as [they are] willing to pay a tax levied on that choice."  *Id.* at 2600.

## VI.   LEAVE TO AMEND

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) of the Federal Rules of Civil Procedure before dismissing the action with prejudice.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).  The Court finds that allowing Plaintiffs to do so here "would prove to be

---

[65]      Plaintiffs' Response [Doc. # 20], at 23.

futile." *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 387 (5th Cir. 2003).  The Court, in this Memorandum and Order, has pointed to deficiencies in Plaintiffs' causes of action that would not be cured through an amended pleading.  Moreover, other plaintiffs have filed cases in other jurisdictions incorporating identical causes of action as alleged here, and Plaintiffs' counsel plainly considered those pleadings before filing in this Court.  Accordingly, it is highly unlikely that Plaintiffs can amend their Complaint to state viable claims for relief against Defendants.  Leave to amend their Complaint is denied.  If Plaintiffs nevertheless seek to amend their Complaint in ways the Court has not anticipated, Plaintiffs must move for reconsideration within 28 days of entry of the Court's final order.

## VII.   CONCLUSION

Plaintiffs have established that the Court has jurisdiction to consider their Origination Clause and Takings Clause claims.  Having considered the issues presented, the Court concludes that Plaintiffs have failed to state a legally cognizable claim as to each of their causes of action.  Leave to amend the complaint would not rectify the deficiencies in the constitutional challenges to the ACA asserted.  It is therefore

**ORDERED** that Defendants Kathleen Sebelius and Jacob J. Lew's Motion to Dismiss [Doc. # 14] is **GRANTED**.   This case is **DISMISSED WITH PREJUDICE**.

A final order of dismissal with be filed separately.

SIGNED at Houston, Texas, this ___10th___ day of **January, 2014.**

Nancy F. Atlas
United States District Judge